UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


v.                                                                                 8:16-CR-235(BKS)


KEITH ERIC JERGENSEN and
DEBASHIS GHOSH,

         **Defendants.**
_____

**APPEARANCES:**

For Defendant Jergensen:
Lisa A. Peebles
Federal Public Defender
Clinton Exchange, Third Floor
4 Clinton Street
Syracuse, NY 13202

For Defendant Ghosh:
John B. Casey
Dreyer Boyajian LLP
75 Columbia Street
Albany, NY 12210

For United States of America:
Grant C. Jaquith
United States Attorney
Michael S. Barnett
Assistant United States Attorney
445 Broadway, Room 218
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

On July 28, 2016, Defendants Keith Eric Jergensen and Debashis Ghosh were charged in a one-count indictment[1] with conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343,[2] 1349.[3]  (Dkt. No. 1).  Trial commenced on October 10, 2017.  After the Government rested its case, Defendants moved for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure; the Court denied the motion.  On October, 18, 2017, the jury returned a verdict of guilty against both Defendants and answered "Yes" in response to a special interrogatory as to whether the conspiracy continued past July 28, 2011, and thus occurred within the five-year statute of limitations.  (Dkt. No. 94).  Presently before the Court are Defendants' renewed motions for judgment of acquittal under Rule 29(c).  (Dkt. Nos. 102, 103).  The Government opposes Defendants' motions.  (Dkt. No. 108).  For the following reasons, Defendants' motions are denied.

---

[1]The Indictment also included a forfeiture allegation under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  (Dkt. No. 1, at 6–7).

[2]Section 1343 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

[3]Section 1349 states: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  18 U.S.C. § 1349.

## II.     EVIDENCE AT TRIAL[4]

Defendants Jergensen and Ghosh were Co-Chief Executive Officers for Verdant Capital Group, LLC ("Verdant").  Verdant was a financial services business; its purpose was to make investments into renewable technologies and companies in the renewable energy market.

In 2010, officers of Laurentian Aerospace Corporation began meeting with Verdant representatives, including Defendants Jergensen and Ghosh, to discuss $200 million in funding for the construction of a facility for the maintenance, repair, and overhaul of wide body airplanes on a former Air Force base in Plattsburgh, New York ("the Project").  (Dkt. No. 110, at 5–6, 9).  Verdant representatives told Robin Wohnsigl, president and CEO of Laurentian, that Verdant was interesting in funding the full amount of the project.  (*Id*. at 10).  Either Jergensen or Ghosh explained to Wohnsigl that Laurentian would need to make an "initial equity deposit" to show other investors that Laurentian had enough confidence in the project to put its own money into it.  (Dkt. No. 110, at 11).  Eventually, it was agreed that Laurentian would make an initial equity deposit of $2.5 million.  (G-5).

According to the memorandum of understanding ("MOU") signed by Ghosh and Wohnsigl on November 30, 2010 and December 2, 2010, Laurentian would deposit $ 2.5 million into a dual signatory account at Wells Fargo Bank N.A. ("Equity Account") within five days of the signing of the MOU.  (G-1; G-2).  It further stated that "no monies will move from the Equity Account . . . for . . . twelve (12) months," that signatures by both a Laurentian and Verdant representative would be required "for any activity" from the Equity Account, and that the funds would stay in that account for one year, after which they would be released to Laurentian.  (G-1;

---

[4] The facts are set forth in the light most favorable to the Government.  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008).

3

G-2; Dkt. No. 110, at 24–25). Additionally, the Equity Account Agreement required Verdant to provide Laurentian with "monthly statements demonstrating account balances." (G-3).

By December 3, 2010, Laurentian had deposited $2.5 million into the Equity Account. (G-4). Between December 8, 2010 and March 18, 2011, without obtaining Laurentian's authorization, Defendants transferred the entire $2.5 million out of the Equity Account into a Verdant Wells Fargo account. (G-4; Dkt. No. 110, at 44; Dkt. No. 111, at 99). Defendants used a significant portion of the money to fund a wind project and also used it to pay Verdant board members, among others.

During this time period, Wohnsigl asked Defendant Jergensen many times verbally and "a few times" in writing for the bank statements. (Dkt. No. 110, at 39). Defendant Jergensen always replied that he would provide them. (*Id.*). Eventually, Wohnsigl contacted Wells Fargo and on March 23, 2011, obtained copies of the November 2010–February 2011 statements. (*Id.*). The bank statements revealed that Laurentian's equity deposit had been transferred to Verdant accounts. (G-4).

On March 25, 2011, Pierre Jeanniot, Chairman of the Laurentian Board of Directors, sent an email to Defendant Jergensen stating that the transfer of the $2.5 million out of the Equity Account violated the terms of the MOU. (G-6). Jeannoit requested that Defendant Jergensen provide a copy of the "bank statement into which the $2.5 million was transferred" by 4:00 p.m. that day. (*Id.*). Defendant Jergensen responded to Jeannoit in an email copied to, among others, Ghosh, falsely stating that "[t]he monies are in a security account that is managed by the Lender[5]

---

[5] There is no evidence that the monies were in an account managed by the Lender. The Lender appears to be a reference to "Selippos," which Defendant Jergensen described as a Greek company "family office or foundation

4

and is located in another section of the bank managed through the Lender." (*Id*.). Defendant Jergensen stated that because the information regarding the status of the Laurentian money was "not in [Verdant's] control," he could not immediately provide the bank statement Laurentian requested but that he expected to be able to provide it during the next week. (*Id*.). Defendant Jergensen further stated that "[b]ecause certain words were used[6] to describe the current status of this transaction, there is now a very heightened scrutiny by our Lender." (*Id*.). Wohnsigl testified that he construed Defendant Jergensen's email as "an admonishment to us not to chase the object of where the money was because it would essentially kill the deal." (Dkt. No. 110, at 63). Defendant Jergensen also wrote that Verdant was "working very hard to conclude the very final aspects of the overall funding of the Laurentian transaction through our primary funders. We have received very positive news today regarding that funding and are optimistic regarding the timing of final transfers." (G-6).

Shortly after receiving Defendant Jergensen's email, Laurentian received a "Corporate Guarantee" on Verdant letterhead, signed by Defendants Jergensen and Ghosh, stating that Verdant "unconditionally and irrevocably guarantees that the amount of [$2.5 million] will be placed in the . . . Laurentian account at Wells Fargo Bank . . . on or before April 29, 2011." (G-7). It further noted that "Debashis Ghosh and Eric Jergensen have also signed this Corporate Guarantee indicating their personal guarantee of [Verdant's] performance hereunder." (*Id*.).

---

which had hundreds of millions of dollars that could be used to invest in Verdant's projects." (Dkt. No. 111, at 10). There is no evidence that Verdant received any money from Selippos.

[6] Wohnsigl testified that he and another Laurentian board member had told Wells Fargo that they "thought there might be a scam or a fraud involved." (Dkt. No. 110, at 61).

When April 29, 2011 came and went, Laurentian's $2.5 million was not returned to the Wells Fargo account. (Dkt. No. 110, at 65).

Laurentian, through its board members, continued to request information on the status of its $2.5 million. (G-9). On or about September 30, 2011, Defendants Jergensen and Ghosh composed a letter to Laurentian falsely stating that "[t]he funds were moved over a period of time, as requested by the Lender, out of the Joint Deposit Account into a separate, secured account at Wells Fargo NA under management of the Lender." (*Id*.). The letter stated that once 1) the funding Verdant was working on was complete or 2) discussions with the "Lender" had been terminated, Laurentian's $2.5 million would be released "from the Lender's secured account into the Joint Deposit Account." (*Id*.). The letter further stated that "[i]f, following the return of the $2,500,000 to the Joint Deposit Account," Verdant or Laurentian decided to terminate their agreement, "then the full deposited amount will be returned" to Laurentian within five business days but that in the event Verdant "elects to go forward with the transaction," they would discuss "the disposition of the $2,500,000" at a later date. (*Id*.).

Laurentian's board members continued to contact Defendant Jergensen via telephone and email about the status of the $2.5 million, but were never told that the money had been spent. (Dkt. No. 110, at 89–90). Wohnsigl explained that Laurentian did not sue Verdant or Defendants because he believed "it would do [Laurentian] no good" and that "there was a carrot hanging out in front of us that said we might be funded for the project, and the project was first and foremost in our minds." (*Id*. at 91–92). Laurentian did not report the lost money to law enforcement, either. Wohnsigl testified that, based on Defendant Jergensen's insinuation in the March 25, 2011 letter that their use of "certain words," i.e., fraud, had complicated the transaction,

6

Laurentian board members were concerned that if it notified law enforcement, it "would spoil the deal." (*Id*. at 92). To date, the money has not been returned to Laurentian and the project has not been funded.

### III.  DISCUSSION

#### A.  Standard of Review

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The test for sufficiency is whether, as to a given count, a 'rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). The Second Circuit has instructed that the Court "must make that determination with the evidence against a particular defendant viewed in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal quotation marks, brackets, and ellipses omitted). "Viewing the evidence in the light most favorable to the government means 'crediting every inference that the jury might have drawn in favor of the government.'" *Id*. (quoting *United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006)). "The conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). "A 'heavy burden' therefore must be borne by one who would challenge a guilty verdict." *Temple*, 447 F.3d at 137 (quoting *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003)). "[I]n passing upon a motion for directed verdict of acquittal," however, "'if

7

there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Id*. (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

### B. Analysis

Defendants argue that they are entitled to a judgment of acquittal because the prosecution is barred by the five-year statute of limitations set forth in 18 U.S.C. § 3282(a). The Indictment was returned on July 28, 2016, thus the conspiracy must have continued beyond July 28, 2011 to fall within the five-year statute of limitations. Defendants contend that the evidence established that the "alleged wire fraud," which was the "main objective of the alleged conspiracy," "was completed before July 28, 2011, because the movement of Laurentian's $2.5 million out of a joint Wells Fargo Account into another Wells Fargo Account that Laurentian could not access occurred by the end of February 2011 and was discovered by Laurentian on or about March 25, 2011. (Dkt. No. 102, at 1–2). The Government responds that "concealment was part of the conspiracy from the outset because the defendants hoped, intended and plotted to conceal the theft long enough (through misrepresentations and omissions) to replace the money before [Laurentian] realized it had been spent, and also in order to try to keep doing business with [Laurentian]." (Dkt. No. 108, at 2).

"'[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.'" *United States v. Grimm*, 738 F.3d 498, 502 (2d Cir. 2013) (quoting *Grunewald v. United States*, 353 U.S. 391, 397 (1957)); *see also United States v. Kerik*,

8

615 F. Supp. 2d 256, 266 (S.D.N.Y. 2009) ("To determine whether any acts in furtherance of a conspiracy were committed in the limitations period, the Court must, as a threshold matter, construe the scope of the alleged conspiracy."). A conspiracy, however, "cannot be extended for statute of limitations purposes by acts of concealment occurring after the conspiracy's criminal objectives have been fully accomplished even if those acts are 'done in the context of a mutually understood need for secrecy.'" *United States v. Fletcher*, 928 F.2d 495, 499 (2d Cir. 1991) (quoting *Grunewald*, 353 U.S. at 402)).

The Indictment charged that Defendants conspired to commit wire fraud by devising a scheme to defraud Laurentian of $2.5 million by misappropriating and diverting the money and misrepresenting, concealing, and disguising information to Laurentian "about the location, safekeeping and use of the money," and specifically identified Defendants' September 30, 2011 email, which occurred within the statute of limitations, as part of the conspiracy to commit wire fraud. (Dkt. No. 1, at ¶¶ 9, 16). Thus, the scope and object of the conspiracy to commit wire fraud was broader than Defendants' transfer of the Laurentian money to Verdant; it included the actions Defendants took to lull Laurentian board members into believing that their money was safe – if not immediately available – and that it would be returned, thus furthering Defendant's object of preventing Laurentian from ending the financing deal and demanding a return of the money. *Kerik*, 615 F. Supp. 2d at 267 (rejecting the defendant's argument that the scope of conspiracy was narrowly limited to his alleged misuse of his public office to help his co-conspirators obtain city licenses and permits, and thus could not continue past his retirement, which was outside the limitations period, because it was "apparent from the allegations in the Superseding Indictment that" obtaining the licenses and permits, which the defendant's co-

9

conspirators continued to apply for within the limitations period, "was the full economic motivation for [the defendant's] co-conspirators.").

Further, although the transfer of Laurentian's money was complete by March 2011 (and outside the statute of limitations), the evidence of Defendants' September 30, 2011 email to Laurentian board members was sufficient to allow the jury to conclude that the conspiracy to commit wire fraud continued into the limitations period. *See United States v. Rogers*, 9 F.3d 1025 (2d Cir. 1993) (affirming the defendant's wire fraud conspiracy conviction, finding it was not barred by the statute of limitations even though he had received the funds at issue prior to the limitations date). In *Rogers*, the defendant submitted falsified lease packages (ostensibly on behalf of the company he worked for) in order to draw on the company's $2 million line of credit with its bank. *Id*. at 1027. By March 1985 (outside the statute of limitations) the company had exhausted its line of credit and "began falling behind on interest payments for both the phony and legitimate leases" and the bank "began requesting the payment of back interest and explanations of why the older leases had not been repaid within 180 days." *Id*. The defendant responded "in a series of letters and telexes," including one sent on June 4, 1985 (within the statute of limitations) in which he "falsely represented the status of the phony lease packages and stated false excuses for the late payments." *Id*. The defendant argued that because he had received the funds that were the object of the wire fraud conspiracy more than five years before the indictment, the statute of limitations barred his prosecution. *Id*. at 1029. The Second Circuit disagreed, explaining

> Count One herein charged that Rogers . . . conspired to, inter alia, commit wire fraud, and that the sending of the telexes in June 1985 was part of that conspiracy. In the context of wire fraud, the Supreme Court has stated that mailings occurring after the receipt of goods obtained by fraud are within the statute if those mailings

10

> were designed "to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Lane*, 474 U.S. 438, 451–52 (1986) (citations and internal quotation marks omitted). In this case, based upon the evidence presented at trial, the jury could have properly found that the conspiracy to commit wire fraud, which was charged in Count One of the indictment, was not complete until after the June 1985 telexes were submitted to [the bank]. As such, the June 1985 communications listed in Count One were overt acts of the conspiracy that took place within the statute of limitations.

*Id*. at 1029–30.

Here, there was evidence from which the jury could find that wire fraud conspiracy continued even after Defendants had misappropriated Laurentian's money and that their September 30, 2011 email,[7] like the telexes in *Rogers*, was part of that conspiracy. Defendants not only falsely stated in the email that Laurentian's $2.5 million was in a secured account managed by the "Lender," when the money had been spent, but also represented that they were "actively involved in attempting to arrange a financing package for Laurentian . . . to assist in funding a wide body aircraft maintenance and repair facility." (G-9). The jury could have found that Defendants designed this email to lead Laurentian board members to believe that their money was safely preserved in a bank account, that funding for the project was in the works, and that the $2.5 million would eventually be returned, thereby postponing a demand for the return of the money or a complaint to authorities. Therefore the jury could have properly concluded that the September 30, 2011 email was part of the wire fraud conspiracy and that the conspiracy continued past July 28, 2011, and into the limitations period. Accordingly, Defendants' motion is denied.

---

[7] As the Government notes, there was also evidence of other misrepresentations and omissions within the five-year statute of limitations. (Dkt. No. 108, at 2).

11

## IV. CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motions (Dkt. Nos. 102, 103) for judgment of acquittal are **DENIED.**

**IT IS SO ORDERED.**

Dated:  January 17, 2018

Brenda K. Sannes
U.S. District Judge

12